**<u>ORAL ARGUMENT NOT YET SCHEDULED</u>**

No. 24-1050 (and consolidated cases)

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

KENTUCKY, ET AL.,
*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
*Respondents*.

---

Petition for Review of Final Administrative Action of the
United States Environmental Protection Agency

---

# FINAL BRIEF OF HEALTH, ENVIRONMENTAL, AND COMMUNITY GROUP RESPONDENT-INTERVENORS

**Dated: October 15, 2024**


Seth L. Johnson
Marvin C. Brown IV
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 797-5245
(202) 794-5355
sjohnson@earthjustice.org
mcbrown@earthjustice.org

*Counsel for Alliance of Nurses for Healthy Environments, American Lung Association, Environmental Defense Fund, Natural Resources Defense Council, Northeast Ohio Black Health Coalition, Rio Grande International Study Center, and Sierra Club*

Shaun A. Goho
Hayden W. Hashimoto
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 678-2516
sgoho@catf.us
hhashimoto@catf.us

*Counsel for Citizens for Pennsylvania's Future and Conservation Law Foundation*

John Walke
Emily Davis
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org

*Counsel for Natural Resources Defense Council*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1)(A), Respondent-Intervenors Alliance of Nurses for Healthy Environments, American Lung Association, Citizens for Pennsylvania's Future, Conservation Law Foundation, Environmental Defense Fund, Natural Resources Defense Council, Northeast Ohio Black Health Coalition, Rio Grande International Study Center, and Sierra Club (collectively, "Health, Environmental, and Community Groups") submit this certificate as to parties, rulings, and related cases.

### I. Parties and *Amici*

#### A. Parties and *Amici* Who Appeared in the District Court

This case is a petition for review of final agency action, not an appeal from the ruling of a district court.

#### B. Parties to This Case

Petitioners' Briefs correctly state the parties to these consolidated cases.

#### C. *Amici* in This Case

*Amici Curiae* in support of Petitioners: In all cases, Government Accountability & Oversight; and Midwest Ozone Group.

*Amici Curiae* in support of Respondents: In all cases, WE ACT for Environmental Justice, Greater Birmingham Alliance to Stop Pollution, West End Revitalization Association, South Bronx Unite, and Community Health Aligning

Revitalization, Resistance & Sustainability (collectively, "Community Groups"); National Parks Conservation Association; Environmental Protection Network ("EPN"); and Institute for Policy Integrity at New York University School of Law.

## II. Circuit Rule 26.1 Disclosure for Health, Environmental, and Community Groups

See disclosure form filed separately.

## III. Ruling Under Review

"Reconsideration of the National Ambient Air Quality Standards for Particulate Matter," 89 FR 16,202 (Mar. 6, 2024).

## IV. Related Cases

Health, Environmental, and Community Groups are not aware of any related cases not already consolidated in this matter.

Dated: October 15, 2024

*/s/ Seth L. Johnson*
Seth L. Johnson

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure and D.C. Circuit Rule 26.1, Alliance of Nurses for Healthy Environments, American Lung Association, Citizens for Pennsylvania's Future, Conservation Law Foundation, Environmental Defense Fund, Natural Resources Defense Council, Northeast Ohio Black Health Coalition, Rio Grande International Study Center, and Sierra Club state that they are non-profit organizations without any parent corporation or stock.

Dated: October 15, 2024

*<u>/s/ Seth L. Johnson</u>*
Seth L. Johnson

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

RULE 26.1 DISCLOSURE STATEMENT ......................................................... iii

TABLE OF AUTHORITIES.............................................................................v

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ................................ viii

INTRODUCTION...........................................................................................1

STATUTES AND REGULATIONS ..............................................................2

STATEMENT OF THE CASE ......................................................................2

SUMMARY OF ARGUMENT......................................................................9

ARGUMENT ..............................................................................................10

I. EPA LAWFULLY AND RATIONALLY FOUND THE 2012 ANNUAL NAAQS INADEQUATELY PROTECTED PUBLIC HEALTH.......................10

A. EPA rationally reconsidered the profoundly flawed 2020 decision.............11

B. The record overwhelmingly supports NAAQS at least as protective as those EPA finalized. ..........................................................................................15

II. THE ADEQUACY OF HEALTH-PROTECTIVE NAAQS DEPENDS SOLELY ON THE HEALTH EFFECTS OF POLLUTANTS IN THE AMBIENT AIR. ..........................................................................................19

A. Non-health factors are legally irrelevant to EPA's decision to reconsider NAAQS. ..........................................................................................21

B. Industry's claim to have discovered a hitherto overlooked statutory interpretation that requires EPA to consider costs is baseless. .....................23

C. As this Court and the Supreme Court have uniformly held, the Act bars EPA from considering non-health factors in reviewing and revising NAAQS.....26

CONCLUSION ............................................................................................31

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alabama v. North Carolina*,
560 U.S. 330 (2010) ........ 24

*Alliance for Cannabis Therapeutics v. DEA*,
930 F.2d 936 (D.C. Cir. 1991) ........ 27

*Am. Petroleum Inst. v. Costle*,
665 F.2d 1176 (D.C. Cir. 1981) ........ 20, 25, 27

*Am. Petroleum Inst. v. EPA*,
684 F.3d 1342 (D.C. Cir. 2012) ........ 25, 29

*Am. Trucking Ass'ns v. EPA*,
175 F.3d 1027 (D.C. Cir. 1999) ........ 20, 24, 25

*Am. Trucking Ass'ns v. EPA*,
283 F.3d 355 (D.C. Cir. 2002) ........ 17

*American Lung Ass'n v. EPA*,
134 F.3d 388 (D.C. Cir. 1998) ........ 5, 29

*City of Chicago v. Fulton*,
592 U.S. 154 (2021) ........ 24

*Coal. of Battery Recyclers Ass'n v. EPA*,
604 F.3d 613 (D.C. Cir. 2010) ........ 5, 13, 19, 29

*FCC v. Fox Television Stations*,
556 U.S. 502 (2009) ........ 17

*Greenlaw v. United States*,
554 U.S. 237 (2008) ........ 24

*Lead Indus. Ass'n v. EPA*,
647 F.2d 1130 (D.C. Cir. 1980) ........ 5, 13, 20, 29

---

Authorities we chiefly rely on are marked with an asterisk.

*Michigan v. EPA*,
576 U.S. 743 (2015) .......................................................................20, 22, 24

*Mississippi v. EPA*,
744 F.3d 1334 (D.C. Cir. 2013) .......................................................6, 14, 17, 22

* *Murray Energy Corp. v. EPA*,
936 F.3d 597 (D.C. Cir. 2019) ............................5, 13, 19, 20, 21, 25, 27, 28, 30

*Nat'l Ass'n of Mfrs. v. EPA*,
750 F.3d 921 (D.C. Cir. 2014) ..................................................................19

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*,
686 F.3d 803 (D.C. Cir. 2012) .......................................................21, 25, 29, 30

*NRDC v. EPA*,
706 F.3d 428 (D.C. Cir. 2013) ..................................................................28

*NRDC v. EPA*,
902 F.2d 962 (D.C. Cir. 1990) .............................................................20, 25

*Physicians for Social Responsibility v. Wheeler*,
956 F.3d 634 (D.C. Cir. 2020) .........................................................7, 12, 13

*Roberts v. Sea-Land Servs.*,
566 U.S. 93 (2012) ...................................................................................25

*Union Elec. Co. v. EPA*,
427 U.S. 246 (1976) .................................................................................21

* *Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ...........................................................5, 20, 21, 25, 28, 30

*Wisconsin v. EPA*,
938 F.3d 303 (D.C. Cir. 2019) ..................................................................27

*Young v. EPA*,
106 F.4th 56 (D.C. Cir. 2024) ....................................................................8

**Statutes**

42 U.S.C. § 7408 ..........................................................................................24

42 U.S.C. § 7409(b)..................................................................................24, 30

42 U.S.C. § 7409(b)(1) ........ 5, 11, 23, 24

42 U.S.C. § 7409(d) ........ 26

* 42 U.S.C. § 7409(d)(1) ........ 5, 23, 24, 30

42 U.S.C. § 7409(d)(2) ........ 6

42 U.S.C. § 7502(c)(6) ........ 28

42 U.S.C. § 7513(f) ........ 28

42 U.S.C. § 7619(b) ........ 28

**Federal Register Notices**

85 FR 24,094 (Apr. 30, 2020) ........ 8

85 FR 82,684 (Dec. 18, 2020) ........ 7, 8

88 FR 5558 (Jan. 27, 2023) ........ 9

89 FR 16,202 (Mar. 6, 2024) ........ 3, 9, 11, 13, 14, 15, 16, 17, 18

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to D.C. Circuit Rule 28(a)(3), the following is a glossary of uncommon acronyms and abbreviations used in this brief:

CASAC.................................................... Clean Air Scientific Advisory Committee

NAAQS .......................................................... National ambient air quality standard

$PM_{2.5}$ .................................................................................Fine particulate matter

$\mu g/m^3$ ......................................................................... Micrograms per cubic meter

## INTRODUCTION

In 2020, the Environmental Protection Agency ("EPA") refused to strengthen core public health protections—national ambient air quality standards—against deadly fine particle pollution. EPA's refusal rested on an unprecedented process for and approach to standard-setting. Facing lawsuits and petitions for reconsideration, EPA opted to reconsider and return to time-tested approaches, strengthening one standard in 2024, just as its staff had recommended in 2020. Attacking EPA's action, but hardly bothering to dispute EPA's scientific judgment, Petitioners return to familiar arguments. They claim the Clean Air Act bars EPA from fixing its manifold errors without starting over, but the Act includes no such requirement. And, though decades of binding precedent establish that EPA cannot consider costs in setting these standards, Petitioners again insist EPA had to consider costs.

Petitioners are wrong. In this brief, Health, Environmental, and Community Groups emphasize two key points: (1) EPA needed to fix its defective 2020 decision, and the statute and evidence supported standards at least as protective as the ones EPA finalized; and (2) Petitioners' challenge to settled caselaw is meritless, with briefs in prior cases confirming Petitioners' arguments here are tried and failed.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in addenda to this brief, the Opening Brief of Industry and Arizona Petitioners ("Ind."), and Respondents' Brief ("Resp.").

## STATEMENT OF THE CASE

1. Fine particulate matter ("$PM_{2.5}$") air pollution kills people. *See, e.g.*, Dkt[1]-1585 ("2022 Supplement") 2-13 to -15, 2-22 to -23 tbl.2-2, JA1853-55, 1862-63; Dkt-0212 ("2019 Science Assessment") ES-16 to -17, ES-22 to -23, 1-30 to -32, 1-39 to -40 tbl.1-2, JA0464-65, 0470-71, 0483-85, 0492-93. *See generally* National Parks Conservation Association Amicus Brief 15-19 (describing health effects). Copious evidence across health disciplines, using several different investigative methods that control for potential confounding factors, demonstrates this, as well as that $PM_{2.5}$ pollution has many other severe health consequences, including:

- Cardiovascular harms (like heart attacks);
- Respiratory harms (like asthma attacks and development of diseases like asthma and chronic obstructive pulmonary disease);

---

[1] All "Dkt" references are to document numbers in EPA docket EPA-HQ-OAR-2015-0072 (*e.g.*, "Dkt-1585" means EPA-HQ-OAR-2015-0072-1585).

- Neurological harms (like dementia and Alzheimer's disease); and
- Lung cancer.

2019 Science Assessment ES-12 to -16, ES-22 to -23, 1-21 to -30, 1-33 to -38 tbl.1-2, 5-1 to -220, 6-1 to -223, 8-1, 8-17 to -61, 10-1 to -77, 11-1 to -102, JA0460-64, 0470-71, 0474-83, 0486-91, 0518-737, 0738-960, 0961, 0962-1006, 1007-83, 1084-185. The already-extensive evidence tying $PM_{2.5}$ pollution to these harms has strengthened over the last 15 years. *See id.* (describing how evidence strengthened from 2009 to about January 2018); 2022 Supplement ES-ii to -iii, 3-1 to -128 (detailing how evidence on mortality and cardiovascular harms strengthened since January 2018), JA1846-47, 1864-991. Though healthy adults can experience these harms, children, older adults, and people with preexisting heart or lung disease are at greater risk. 89 FR 16,202, 16,234/3-35/3 (Mar. 6, 2024), JA0195-96.

Extensive evidence further demonstrates that exposure to and harms from $PM_{2.5}$ pollution disproportionately fall on Black populations, broader communities of color, and low-income communities. *See, e.g., id.* 16,235/3-36/1, JA0196-97; Dkt-2233 ("Community/Environmental Comments") 26-28, 31-37, 42-43, 45, JA2177-79, 2182-88, 2193-94, 2196; Community Groups Amicus Brief ("Community-Amici") 10-19. For example, one study found average $PM_{2.5}$ pollution exposure from U.S. anthropogenic pollution sources was 6.5 micrograms

per cubic meter ("$\mu g/m^3$"), but it was 7.4 $\mu g/m^3$, 7.9 $\mu g/m^3$, and 7.2 $\mu g/m^3$, for people of color overall, Black populations, and Latino populations, respectively. Community/Environmental Comments 31-32 (discussing Tessum et al. (2021), JA2661), JA2182-83; *accord, e.g.*, *id.* 31 (discussing Mikati et al. (2018), JA2655, which also finds disproportionate exposure for Black populations, broader communities of color, and people experiencing poverty), JA2182. The mortality rate from $PM_{2.5}$ pollution for older Black populations is three times the general population rate. *Id.* 28, 34 (discussing Di et al. (2017), JA0418, and Industrial Economics (2023), JA2540), JA2179, 2185. Such disparities persist even when controlling for income. *See id.* 28 (discussing Thind et al. (2019), JA2668), JA2179.

Tens of millions face these disproportionate burdens and risks. Children, older adults, people with heart or lung disease, Black populations, Latino populations, and broader communities of color make up a significant percentage of the U.S. population. *See* Dkt-1584 ("2022 Policy Assessment") 3-55 to -59 & tbls.3-2, 3-3, JA1611-15.

2. The Clean Air Act requires EPA to set primary national ambient air quality standards ("NAAQS") for pollutants like $PM_{2.5}$ "at a level at which there is

'an absence of adverse effect' on…sensitive individuals."[2] *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1153 (D.C. Cir. 1980); *accord, e.g., Coal. of Battery Recyclers Ass'n v. EPA*, 604 F.3d 613, 618 (D.C. Cir. 2010); *see* 42 U.S.C. § 7409(b)(1). EPA must protect public health from "not just known adverse effects, but those of scientific uncertainty or that research has not yet uncovered." *American Lung Ass'n v. EPA*, 134 F.3d 388, 389 (D.C. Cir. 1998) (cleaned up). At least every five years, EPA must review NAAQS and revise them to ensure they meet the Act's substantive requirements. *See* 42 U.S.C. § 7409(d)(1). NAAQS must be based exclusively on protecting health, without regard to implementation costs or attainability. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 465-71 (2001); *e.g., Murray Energy Corp. v. EPA*, 936 F.3d 597, 621-24 (D.C. Cir. 2019). Costs become relevant when implementing NAAQS.[3] *See Whitman*, 531 U.S. at 470.

3. After EPA strengthened the annual $PM_{2.5}$ NAAQS in 2012, its next review went awry. It began ordinarily in 2015, with EPA laying out a process for

---

[2] All references herein to "NAAQS" pertain solely to primary NAAQS, the only type of NAAQS at issue here.

[3] Other federal anti-pollution efforts and state creativity will assist with low-cost implementation. *See* Community/Environmental Comments 156-66, JA2307-17; State Intervenors' Br. ("State-Resp.-Ints.") 19-22 & n.5; *see also* Brief of Institute for Policy Integrity as Amicus Curiae ("IPI-Amicus") 7-9 (EPA estimated moderate costs, overwhelmingly outweighed by health benefits).

the review and empaneling a pollutant-specific committee of outside expert scientific advisors along with the seven-member Clean Air Scientific Advisory Committee ("CASAC") the Act requires EPA to consult in the review process. *See* Dkt-0037 ("IPMRP Comments") D-1 to -3, JA0408-10; 2022 Policy Assessment 1-12 to -13, JA1575-76; *see* 42 U.S.C. § 7409(d)(2); *see also, e.g., Mississippi v. EPA*, 744 F.3d 1334, 1354-55 (D.C. Cir. 2013) (explaining CASAC's importance).

But EPA abruptly changed its process in 2017-2018. It abandoned its previously established schedule, excluded many scientists from serving on advisory committees on purported ethical grounds (that scientists who received EPA grants could somehow be biased), replaced most of CASAC, and disbanded the pollutant-specific panel. *E.g.*, IPMRP Comments B-2 to -3, C-45 to -47, C-49, JA0375-76, 0399-401, 0403. The newly constituted CASAC confessed that "[a]dditional expertise [wa]s needed for [it] to provide a thorough review" of the NAAQS, criticized EPA for disbanding the panel, and sought help. Dkt-0251 at 1, JA1189; *see* Dkt-0973 at 30-32, JA1248-50. EPA responded with a novel "pool" of 12 consulting "experts" from whom CASAC could seek only written advice, itself a new limitation that several CASAC members criticized as unhelpful. Dkt-0224, JA1186; Dkt-0260 at B-2, B-29, JA1198, 1199. EPA's new ethics policy limited the candidates eligible to be consultants, and that pool ultimately lacked relevant expertise. Dkt-0973 at 28, JA1246. This Court later held EPA's excluding

grant recipients from advisory roles was arbitrary and unlawful, in part because EPA did not "confront[] the possibility that excluding" them might deprive EPA of "the most qualified, knowledgeable, and experienced candidates." *Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 644-49 (D.C. Cir. 2020).

The evidence available by 2020 demanded strengthened NAAQS. EPA's in-house scientists told the agency so, concluding in 2020 that the evidence called into question the adequacy of the existing NAAQS (12 $\mu g/m^3$ (annual) and 35 $\mu g/m^3$ (24-hour)) and supported strengthening the annual NAAQS to as stringent as 8 $\mu g/m^3$. Dkt-0262 ("2020 Policy Assessment") 3-105 to -118, JA1206-19. Former CASAC and pollutant-specific panel members, and community, health, and environmental groups, similarly found the science strong enough to support an annual NAAQS of 8 $\mu g/m^3$ <u>and</u> a strengthened 24-hour NAAQS as low as 25 $\mu g/m^3$. *E.g.*, IPMRP Comments 4, B-20 to -31, JA0371, 0387-98; Dkt-0973 at 180-82 (environmental groups), JA1253-55; Dkt-0702 (health groups), JA1223-32; Dkt-0752 (community and environmental groups), JA1233-35.

In late 2020, however, EPA retained all its prior particle pollution NAAQS, notably taking a new approach toward the annual $PM_{2.5}$ NAAQS. 85 FR 82,684, 82,684/1 (Dec. 18, 2020), JA1256; *see* Brief of Amicus Curiae Environmental Protection Network ("EPN-Amicus") 15-17 (describing how 2020 review took unprecedented approach to setting annual NAAQS). On top of its myriad

procedural irregularities, EPA changed its rationale on the annual NAAQS between its proposed and final decision. For example, to dismiss epidemiological studies finding severe health effects occurring at pollution levels allowed by the annual NAAQS, EPA proposed to rely simply on purported "uncertainties" about whether health effects those studies observed are caused by $PM_{2.5}$ pollution. *See* 85 FR 24,094, 24,119/2-21/1 (Apr. 30, 2020), JA0415-17. But EPA ultimately added brand-new bases for dismissing some of those studies and assessing the results of others. *See* 85 FR 82,716/2-18/1, JA1288-90.

Lawsuits and petitions for administrative reconsideration followed. *See California v. EPA*, No. 21-1014 (D.C. Cir. Jan. 13, 2021); Dkt-1241, JA1321; Dkt-1242, JA1455. One reconsideration petition explained how EPA's rationale had changed, without any opportunity for public comment, and identified additional studies further supporting strengthened NAAQS; another similarly identified additional such studies. Dkt-1242 at 5-11, JA1459-65; Dkt-1241 at 10-19, JA1332-41.

Within six months of the judicial and administrative challenges, EPA initiated its reset of CASAC, without arbitrary limitations on who could serve, and announced it would reconsider the 2020 decision. Dkt-1285, JA1482; Dkt-1273, JA1478; *see Young v. EPA*, 106 F.4th 56, 60 (D.C. Cir. 2024) (finding no evidence EPA reset process was biased, but instead "direct evidence" of "a fair selection

process”). That reconsideration would rely on careful scientific review and CASAC advice, supported by a genuinely expert panel that fully participated in CASAC’s deliberations. Dkt-1273, JA1478; Dkt-1277, JA1480; *see* 89 FR 16,210/2-13/3 (describing reconsideration decision and process), JA0171-74. And, given the evidence’s strength, all CASAC members agreed that EPA needed to strengthen the annual NAAQS. Dkt-1593 (“2022 CASAC Review”) 15, JA2017.

EPA’s process and final decision were deliberate and conservative. EPA initially intended to issue a proposal in summer 2022 and final action in spring 2023, but moved more slowly. *See* Dkt-1273 at 2 (intentions), JA1479; 88 FR 5558 (Jan. 27, 2023) (proposal), JA0001; 89 FR 16,202 (final), JA0163. Community, environmental, and health organizations explained the scientific underpinnings for the strongest NAAQS that CASAC’s majority recommended: 8 $\mu g/m^3$ (annual) and 25 $\mu g/m^3$ (24-hour). *E.g.*, Community/Environmental Comments 23-107, JA2174-258; Dkt-2348 at 1-10, 12-14 (health groups), JA2322-31, 2333-35; *see* 2022 CASAC Review 16-17, JA2018-19. Ultimately, EPA strengthened just the annual NAAQS, to 9 $\mu g/m^3$. 89 FR 16,202/1, JA0163.

## SUMMARY OF ARGUMENT

EPA reasonably exercised its authority to reconsider the deeply flawed 2020 decision. Thoroughly irregular, that 2020 decision clashed with the record, EPA’s past practice, and this Court’s precedent. EPA couldn’t have retained it rationally.

The record overwhelmingly supported EPA's decision to strengthen the NAAQS and would have supported even greater strengthening. Binding precedent further refutes Petitioners' record-based protestations.

Petitioners' other arguments seek once again to rewrite the Act, contrary to controlling caselaw. The Act makes health the sole consideration for EPA in the NAAQS-setting process. Petitioners insist they have discovered a loophole in 40+ years of consistent precedent from this Court and the Supreme Court, an argument that is neither credible nor, as review of prior briefs confirms, correct. Their remaining arguments are similarly barely disguised efforts to revive claims that have already failed.

## ARGUMENT

### I. EPA LAWFULLY AND RATIONALLY FOUND THE 2012 ANNUAL NAAQS INADEQUATELY PROTECTED PUBLIC HEALTH.

Petitioners wrongly insist the Act bars EPA from reconsidering the 2020 decision and that EPA arbitrarily did so, Ind. 23-28; Br. for State Pet'rs' ("State-Pet'rs") 25-32.[4] To the contrary, the Act allows EPA to reconsider the 2020 decision, *see* Resp. 27-45; State-Resp.-Ints. 4-12, and EPA was fully justified in

---

[4] We generally respond below to Industry's cost-based arguments (at 28-32) regarding reconsideration. *See infra* pp.21-22.

doing so, given that decision's profound flaws. Notably, State Petitioners' ("Kentucky's") claim (at 21-29) that "environmental justice" is irrelevant to § 7409(b)(1) and (d)(1) assumes that overburdened communities aren't entitled to full protection under NAAQS. That assumption flouts the Act and precedent. *See* Community-Amici 5-10; *see also* Resp. 74-79 (refuting Kentucky's improper motives argument).

Though Petitioners quibble with EPA's decision to set the annual NAAQS at 9 $\mu g/m^3$, Ind. 42-44; State-Pet'rs 32-38, they demonstrate merely that they disagree with EPA's technical judgment, not that there was anything unreasonable about EPA's action. *See* Resp. 60-66, 69-73. Rather, the record supports the NAAQS that EPA set and in fact would support even stronger NAAQS.

### A. EPA rationally reconsidered the profoundly flawed 2020 decision.

EPA was well-justified in reconsidering its 2020 decision. *See* Resp. 75-76, 81; *see also* Dkt-1273 (contemporaneously explaining decision to reconsider), JA1478; 89 FR 16,210/2-11/2 (further explanation), JA0171-72. Evidence available in 2020 convinced EPA staff and outside experts that stronger NAAQS were warranted at that time. *E.g.*, 2020 Policy Assessment 3-105 to -118, JA1206-19; IPMRP Comments 4, JA0371. Kentucky falsely asserts (at 26) that EPA followed "the standard process" in refusing in 2020 to revise the NAAQS, but EPA took numerous irregular steps that fundamentally infected that decision, including:

(1) Discarding existing plans for completing its NAAQS review, *see* IPMRP Comments B-2, JA0375;

(2) Issuing an arbitrary and unlawful policy that limited who could serve on advisory committees, including CASAC, *see Physicians*, 956 F.3d at 644-49;

(3) Reconstituting CASAC under that arbitrary policy and disbanding the previously appointed expert panel intended to assist CASAC, leading CASAC to acknowledge it lacked the expertise necessary to review the NAAQS, IPMRP Comments B-2 to -3, C-45 to -47, C-49, JA0375-76, 0399-401, 0403; Dkt-0251 at 1, JA1189;

(4) Creating an ad hoc pool of consultants, appointed under EPA's arbitrary policy, with whom CASAC could communicate only in writing and that also lacked expertise, Dkt-0260 at B-2, B-29, JA1198, 1199; Dkt-0973 at 28-29, JA1246-47;

(5) Changing EPA's basis for retaining the annual NAAQS from the proposal to the final action, though both bases were arbitrary, and inconsistently treating newer science, *see, e.g.*, Dkt-1242 at 5-8, JA1459-62; and

(6) Relying on an approach to assessing epidemiological studies that EPA had never before followed, and that would leave at-risk populations exposed to elevated $PM_{2.5}$ pollution levels, *see* Resp. 17, 63-66; EPN-Amicus 15-17.

*See supra* pp.6-8. In assessing epidemiological studies, EPA also heavily weighted

uncertainties. 89 FR 16,276/1, JA0237.

The deep flaws in these key 2017-2020 choices were obvious by early 2021. Courts had held EPA's appointments policy irrational and unlawful. *E.g.*, *Physicians*, 956 F.3d at 644-49. Some choices (EPA's treatment of CASAC, bases for retaining the NAAQS, and approach to epidemiological studies) conflicted with EPA's prior practice. Some (EPA's bases for retaining the NAAQS and approach to epidemiological studies) further conflicted with this Court's caselaw, which prohibits EPA from leaving sensitive populations to experience adverse health effects and requires EPA to take a precautionary approach to uncertainty. *E.g.*, *Battery Recyclers*, 604 F.3d at 618 ("[I]f a pollutant adversely affects the health of…sensitive individuals, EPA must strengthen the entire national standard." (cleaned up)); *Lead Indus.*, 647 F.2d at 1155 (Act's "precautionary and preventive orientation" calls for EPA "to act in the face of uncertainty" and "to err on the side of caution"). And after finalizing its decision, EPA received reconsideration petitions that further described how its decision conflicted with more recently developed scientific papers. Dkt-1242 at 7-11, JA1461-65; Dkt-1241 at 4-5, 11-16, JA1326-27, 1333-38.

Accordingly, EPA's 2020 decision exemplifies a review that contains "deficiencies." *Murray Energy*, 936 F.3d at 609. Scientific developments that coincided with or immediately followed its end provided "additional certainty" that

the 2020 decision wasn't tenable. *Mississippi*, 744 F.3d at 1344 ("[A]dditional certainty about what was merely a thesis might very well support a determination that the line marked by the term 'requisite' has shifted."). Even Kentucky acknowledges that new scientific studies, using different analytical techniques, had come out, and that EPA had at least some "real reason" to undertake reconsideration. State-Pet'rs 11-12, 14, 27-28. Thus, EPA reasonably reconsidered its severely defective 2020 decision.

Yet Kentucky claims some scientific "uncertainty" remains, and wrongly surmises EPA thus irrationally reconsidered the 2020 decision, *see id.* 34-37. Kentucky gets the Act backward: uncertainties in scientific evidence are "inevitable," but EPA must make rational decisions consistent with the Act's "mandate to take a preventative approach." *Mississippi*, 744 F.3d at 1344; *accord id.* 1357 ("[W]here EPA operates within the realm of uncertain science, its decisions about the appropriate NAAQS level must necessarily rest largely on policy judgments." (cleaned up)). EPA rationally considered uncertainties and the extensive, consistent results of studies using various methods for assessing confounding, and concluded, consistent with its own staff and external experts, that the record supported reconsideration—and ultimately stronger NAAQS. *E.g.*, 89 FR 16,225/3-26/1, 16,256/3, JA0186-87, 0217; Dkt-6025 ("RTC") 13-17, JA2692-96.

### B. The record overwhelmingly supports NAAQS at least as protective as those EPA finalized.

Petitioners complain fundamentally about EPA's analysis of uncertainties and refusal to set the NAAQS to protect only against average pollution exposures. Ind. 42-44; State-Pet'rs 32-38. Their complaints founder scientifically and legally. The scientific record supported strengthening NAAQS at least as much as EPA did here. The Act doesn't require the degree of certainty Petitioners apparently demand, and EPA reasonably adjusted its approach to uncertainty. Further, the Act mandates EPA protect all populations, not just average ones, against harmful air pollution.

Copious evidence illustrated the prior NAAQS were inadequate. In strengthening the annual NAAQS to 9 $\mu g/m^3$, EPA chiefly relied on average (or mean) $PM_{2.5}$ concentrations in "key" U.S. epidemiological studies reporting associations between $PM_{2.5}$ pollution exposures and death and illness; it also considered other percentile concentrations and data analysis methods, Canadian epidemiological studies, controlled human exposure studies, and a risk assessment. *E.g.*, 89 FR 16,278/2, 16,280/1-2, 16,284/2-3, JA0239, 0241, 0245; *see* Resp. 60-64. Many of the "key" epidemiological studies reported mean $PM_{2.5}$ levels below 12 $\mu g/m^3$, with several below 10. 89 FR 16,244-45 figs.1-2, JA0205-06. EPA also noted that a new "at-risk analysis" indicated that strengthening the annual NAAQS

could "help to mitigate exposure and risk disparities" for communities of color. *Id.* 16,251/1, JA0212; 2022 Policy Assessment 3-156 to -164, JA1712-20.

EPA's focus on the lowest mean level reported in the key epidemiological studies both was consistent with EPA's historical approach and provided EPA ample certainty that health harms occurred at that mean level. Resp. 61-64; EPN-Amicus 17-20. Many modern epidemiological studies rest on tens or hundreds of millions of data points, meaning they have great statistical force. *E.g.*, Dkt-2125 at 2-4, 8, JA2039-41, 2042; *see* Community/Environmental Comments 58 (similar, and describing Dkt-2125 and Dkt-1522's author), JA2209; *see also* 2022 Supplement 3-22 (relating "larger case counts" to improved "statistical power needed to detect associations"), JA1885. Thus, though EPA had <u>greatest</u> confidence in the results at the study-reported means, *e.g.*, 89 FR 16,284/1, JA0245, CASAC members and other scientific experts noted EPA's approach was "conservative since robust data clearly indicate effects below the mean in concentration-response functions." 2022 CASAC Review 16, JA2018; *accord, e.g.*, Dkt-1522 at 13-14, JA1546-47; *see also* Community/Environmental Comments 57-60, JA2208-11.

Accordingly, the CASAC majority found the science supported even an annual NAAQS of 8 $\mu g/m^3$—as well as a stronger 24-hour NAAQS. 2022 CASAC Review 16-17, JA2018-19. So did leading health and medical groups. Dkt-2348 at

1-10, 12-14, JA2322-31, 2333-35. Canada and the World Health Organization also have stronger standards than EPA's. Community/Environmental Comments 16-17, JA2167-68. Petitioners provide no valid reason EPA and all these other entities' judgments are irrational.

Petitioners' reliance on uncertainty is unavailing, State-Pet'rs 32-38; Ind. 42-43. This Court has long recognized that "the Act requires" EPA to set NAAQS despite "significant scientific uncertainty." *Am. Trucking Ass'ns v. EPA*, 283 F.3d 355, 369-70 (D.C. Cir. 2002) (upholding EPA's decision to set $PM_{2.5}$ NAAQS despite "significant scientific uncertainty," "just as the Act requires"); *see supra* p.13; Resp. 69-70 (citing *Mississippi* and *Lead Industries*). EPA carried its burden to explain bringing its approach to uncertainty more in-line with the Act. *E.g.*, 89 FR 16,256/3, 16,275/2-76/2, 16,279/1, JA0242, 0236-37, 0240; *see* Resp. 70-71, 73; *FCC v. Fox Television Stations*, 556 U.S. 502, 515-16 (2009) ("mere fact of policy change" doesn't require "more detailed justification"); *Mississippi*, 744 F.3d at 1343 (prior NAAQS lacks "presumptive validity"), 1357 (decisions regarding "uncertain science" "rest largely on policy judgments"). Notably, EPA staff had already found strengthened NAAQS warranted by 2020, as did leading outside experts. *E.g.*, 2020 Policy Assessment 3-105 to -118, JA1206-19; IPMRP Comments 4, B-20 to -31, JA0371, 0387-98; Dkt-0702 (health groups), JA1223-32.

Changed facts strongly supported EPA's changed position anyhow. Two CASAC members served for both the 2020 and 2024 decisions; one consistently found the science demanded strengthening the annual NAAQS, while the other disagreed in the earlier process, but, driven by the scientific evidence, switched on reconsideration to support strengthening. 89 FR 16,257/3 n.93, JA0218; *see* 2022 CASAC Review A-16, JA2021; Resp. 20; *see also, e.g.*, 89 FR 16,225/3-27/1, 16,229/2-3, 16,230/3, 16,256/3-57/2 (discussing studies that reduced uncertainties), JA0186-88, 0190-91, 0217-18.

Industry further claims (at 43-44) EPA didn't explain why it rejected setting the annual NAAQS 15-18% above the lowest study-reported mean. *See also* State-Pet'rs 34-37 (invoking similar EPA rejection as example of purportedly unresolved uncertainty). That inflation represents the average relationship between areas' highest officially reported $PM_{2.5}$ pollution levels, used for assessing compliance (the "design value"), and areas' study-reported mean pollution levels. But EPA clearly explained why it rejected that approach: it would allow pollution above levels EPA was most confident were harmful. *E.g.*, 89 FR 16,263/1-2, 16,280/1, 16,283/1-2, JA0224, 0241, 0244; Resp. 65-66; *see* RTC 56, JA2735. Notably, EPA rejected a similar approach in 2012, when it eliminated a "spatial averaging" compliance option that "would enable some portions of a compliance area—particularly those areas where sensitive individuals are likely to live—to exceed

the NAAQS for periods of time." *Nat'l Ass'n of Mfrs. v. EPA*, 750 F.3d 921, 925 (D.C. Cir. 2014); *see* EPN-Amicus 10-15; Community/Environmental Comments 62-63, 71-73, JA2213-14, 2222-24.

Indeed, EPA would have violated the Act had it followed Industry's preferred approach. Millions live near monitors that establish areas' design values (i.e., report the most pollution), and they are more likely to be people of color and living in poverty. Community/Environmental Comments 61-62, JA2212-13. Under Industry's approach, because the mean pollution level in the broader area is lower, EPA would allow the air around these sensitive residents' homes to be dirtier than the study-reported mean level at which EPA found harmful health effects occur. The Act doesn't permit this result—it gives everyone the equal right to clean air. *E.g.*, *Battery Recyclers*, 604 F.3d at 618 (if pollution harms "sensitive individuals, EPA must strengthen the entire national standard").

## II. THE ADEQUACY OF HEALTH-PROTECTIVE NAAQS DEPENDS SOLELY ON THE HEALTH EFFECTS OF POLLUTANTS IN THE AMBIENT AIR.

This Court and the Supreme Court have established that the Act unambiguously requires EPA to set health-protective NAAQS for a pollutant based solely on the health effects caused by that pollutant in the ambient air, without regard to other factors, including the sources of the pollutant or costs of implementing the NAAQS. *E.g.*, *Murray Energy*, 936 F.3d at 621-24; *Whitman*,

531 U.S. at 465, 469; *Am. Trucking Ass'ns v. EPA*, 175 F.3d 1027, 1040-41 (D.C. Cir. 1999) ("*ATA I*"), *aff'd in relevant part sub nom. Whitman*, 531 U.S. 457; *NRDC v. EPA*, 902 F.2d 962, 972-73 (D.C. Cir. 1990), *vacated in other part*, 921 F.2d 326 (D.C. Cir. 1991); *Am. Petroleum Inst.* ("*API*") *v. Costle*, 665 F.2d 1176, 1185 (D.C. Cir. 1981); *Lead Indus.*, 647 F.2d at 1148-50 & n.39. These controlling holdings have come in the context of initial NAAQS-setting and, more commonly, NAAQS-revision, and before and after the Supreme Court's 2015 *Michigan v. EPA* decision. *E.g.*, *Murray Energy*, 936 F.3d at 621-24 (revision); *Whitman*, 531 U.S. at 463, 471 (revision); *ATA I*, 175 F.3d at 1040-41 (revision); *Lead Indus.*, 647 F.2d at 1148-51 (initial); *see also Michigan v. EPA*, 576 U.S. 743, 755-56 (2015) (distinguishing *Whitman*).

Fighting overwhelming precedent, Petitioners raise three arguments, most already considered and rejected by this Court and the Supreme Court: (1) EPA should have considered costs when it decided whether to reconsider the 2020 decision, Ind. 28-32; (2) EPA, this Court, and the Supreme Court have unanimously misread the Act such that all the existing caselaw holding costs and other non-health factors irrelevant to NAAQS-setting is distinguishable, *id.* 33-42; and (3) if binding precedent is indistinguishable, it is wrong, *id.* 34 n.14. *See also*

State-Pet'rs 17 n.14, 39 (adopting Industry arguments). Petitioners are wrong across the board.[5]

Binding precedent and the Act foreclose their arguments. *See* Resp. 45-52, 56-59, 66-68; *Whitman*, 531 U.S. at 464-71; *Murray Energy*, 936 F.3d at 621-24; *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 686 F.3d 803, 813 (D.C. Cir. 2012) ("*NEDACAP*"). Injecting cost and other non-health concerns into the NAAQS-setting process would flout the Act's plain language and severely undermine the effectiveness of the NAAQS program that Congress established as "the engine that drives nearly all of Title I of the [Act]" and enacted as "a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution." *Whitman*, 531 U.S. at 468; *Union Elec. Co. v. EPA*, 427 U.S. 246, 256 (1976).

### A. Non-health factors are legally irrelevant to EPA's decision to reconsider NAAQS.

Industry's argument (at 28-32) that EPA must consider costs in deciding whether to engage in reconsideration puts the cart before the horse. Considering costs would require EPA to speculate about potential costs associated with potential NAAQS, the stringency of which the agency is only at the beginning

---

[5] Kentucky's arguments that EPA <u>must consider non-health factors</u> runs against its principal argument (at 21-29)—that EPA <u>erred by considering non-health factors</u>.

stages of determining. *See* State-Resp.-Ints. 18-23 (states determine implementation costs). Any such speculation would be essentially meaningless, particularly because costs are ultimately irrelevant to EPA's final decision. Contrary to Industry's claim (at 28-29), *Michigan* is inapposite because it addresses a decision whether "to regulate" particular sources directly, not the pre-preliminary decision at issue here, whether to embark on a decision-making process that may not result in further regulation, which states would implement. 576 U.S. at 752-53 (agency decision was "whether 'regulation is appropriate and necessary'" (emphasis in original)); *accord, e.g., id.* 756 (at issue is "the initial decision to regulate").

Industry also wrongly seeks (at 29-30) support from the 2011 decision to abandon reconsideration of the 2008 ozone NAAQS. Even if Industry is correct that the 2011 decision was based on cost, *but see* IPI-Amicus 20-23; Resp. 85, whether cost was a lawful factor in the 2011 decision was disputed, then and now, as contrary to the Act's approach, and has never been judicially resolved. *E.g.*, Community/Environmental Comments 142-43, JA2293-94; *see Mississippi*, 744 F.3d at 1341-42 (2011 action was "non-final," and Court dismissed challenge to it). The solitary 2011 decision accordingly doesn't vindicate Industry's demand that EPA consider costs here.

### B. Industry's claim to have discovered a hitherto overlooked statutory interpretation that requires EPA to consider costs is baseless.

Despite this Court, and the Supreme Court, consistently holding that EPA may not consider costs in its NAAQS-setting process, Industry again advances a statutory interpretation to bring costs into the NAAQS-setting process: that what EPA must consider in determining under § 7409(d)(1) whether to revise a NAAQS differs from what it must consider when it then revises that NAAQS under § 7409(b)(1), *see* Ind. 33-34; *see also id.* 6, 24 (describing statutory interpretation). To make this argument, Industry insists all existing cases (except perhaps one) address only the NAAQS-setting decision, not the decision whether to revise NAAQS. *Id.* 37-39, 42. Both the statutory interpretation and revisionist approach to this Court's and the Supreme Court's precedent are meritless, as review of briefs in those cases confirms.

Industry's argument would do violence to the Act and vitiate decades of unbroken, unanimous D.C. Circuit and Supreme Court precedents holding EPA cannot consider costs in revising NAAQS. Requiring EPA to consider costs in determining whether to revise a NAAQS, but barring EPA from considering them in determining how to revise a NAAQS would yield self-defeating, contradictory results. For example, EPA could find it appropriate to revise a NAAQS under § 7409(d)(1) to achieve anticipated co-benefits unrelated to the regulated pollutant, but could not set it in that "appropriate" way when EPA considers only the

regulated pollutant's health effects in the NAAQS-setting process under § 7409(b)(1). This Court should not read the Act as "so internally inconsistent." *Greenlaw v. United States*, 554 U.S. 237, 251 (2008); *see, e.g., City of Chicago v. Fulton*, 592 U.S. 154, 160 (2021) (rejecting statutory interpretation that "would render the commands of [two statutory provisions] contradictory").

Industry's assertion that EPA must apply "<u>different</u> standards" to assessing whether and how to revise NAAQS similarly fails, Ind. 33-35 (emphasis in original). Resp. 48-50. Nothing in the Act suggests EPA has separate statutory obligations to decide whether and <u>then</u> how to revise NAAQS: the Act simply directs EPA to "make…revisions… in accordance with" § 7409(b). 42 U.S.C. § 7409(d)(1). Atextually, Industry seeks (at 33-34) to sever "in accordance with" from the unitary phrase that EPA "shall complete a thorough review of…the…[NAAQS]…and shall make such revisions in such…[NAAQS]…as may be appropriate in accordance with" §§ 7408 and 7409(b). 42 U.S.C. § 7409(d)(1). But, textually, "appropriate" is connected to and limited by "in accordance with [§§ 7408 and 7409(b)]," as this Court has correctly held. *ATA I*, 175 F.3d at 1040-41; *see Alabama v. North Carolina*, 560 U.S. 330, 348 n.1 (2010) (where one provision creates requirement that must be met "in accordance with" another provision, latter provision clarifies term's meaning in former provision); *see also Michigan*, 576 U.S. at 752 (in some contexts, "appropriate and necessary"

"undoubtedly" "does not encompass cost"). Contrary to Industry's claim (at 34-35), EPA applying the same statutory provision to assess both whether and how to revise NAAQS renders no portion of the Act superfluous; it harmonizes the Act. *See, e.g.*, *Roberts v. Sea-Land Servs.*, 566 U.S. 93, 100 (2012) ("[O]ur task is to fit, if possible, all parts into an harmonious whole.").

Industry's strained attempt to distinguish precedent fares no better. Each time EPA has revised any health NAAQS, courts have reviewed that action, with questions about non-health factors arising repeatedly. *API*, 665 F.2d 1176; *NRDC*, 902 F.2d 962; *ATA I*, 175 F.3d 1027; *Whitman*, 531 U.S. 457; *API v. EPA*, 684 F.3d 1342 (D.C. Cir. 2012); *NEDACAP*, 686 F.3d 803; *Murray Energy*, 936 F.3d 597. These decisions make clear that EPA cannot consider non-health factors in deciding how to revise NAAQS—and how to revise NAAQS encompasses whether to revise them. Resp. 52.

Indeed, this Court and the Supreme Court have already considered and rejected Industry's argument that EPA must consider costs when deciding whether to revise NAAQS. Petitioners' argument in *ATA I* was "that consideration of costs is one pertinent factor in determining whether revision of a NAAQS is 'appropriate,'" and this Court rejected it. 175 F.3d at 1040 (emphasis added). Industry petitioners retried that argument in *Whitman*, insisting that § 7409(d)(1)'s "as may be appropriate" language required EPA to consider costs when deciding

"whether a change in its earlier NAAQS…decision is 'appropriate.'" Appalachian Power Co. Reply 12, *Am. Trucking Ass'ns v. Whitman*, No. 99-1426 (U.S.) (emphasis added), JA2845; *accord* Appalachian Power Co. Resp. Br. in Support of Cross-Pet'rs 39-42, *Am. Trucking*, No. 99-1426 (U.S.) (arguing § 7409(d) requires EPA to consider costs "of [d]ecisions [w]hether to [r]evise" NAAQS and that "appropriate" demands "evaluat[ing] a broad range of relevant factors"), JA2839-41. Failed in *Whitman*, that argument fails here, too. *See also infra* p.30 (petitioners raised substantially identical argument about "appropriate" in D.C. Circuit case).

### C. As this Court and the Supreme Court have uniformly held, the Act bars EPA from considering non-health factors in reviewing and revising NAAQS.

Industry's arguments (at 36-42) for injecting specific non-health factors into the NAAQS-setting process are meritless. EPA correctly explains (at 45-47) that the Act bars it from considering costs at any point in the NAAQS-setting process. *See also* Community/Environmental Comments 4-10 (detailing statute, legislative history, and caselaw), JA2155-61. Health, Environmental, and Community Groups add three key points: (1) EPA is categorically barred from considering attainability; (2) current air quality conditions are similarly legally irrelevant; and (3) there is no nondelegation issue here.

**Attainability**: Contrary to Industry's claim (at 38-41), the Act prohibits EPA from considering attainability in NAAQS-setting. *API*, 665 F.2d at 1190 ("[T]he question of attainability is not relevant to the setting of ambient air quality standards under the Clean Air Act."); *see Murray Energy*, 936 F.3d at 622-24 (holding "the Clean Air Act prohibits EPA from adjusting for background ozone in setting the NAAQS").[6] Industry principally relies on the statutory interpretation and efforts to distinguish this Court's binding precedent refuted above, *see supra* pp.23-26, concerns about wildfire impacts on air quality, and an ancillary provision. *See* Ind. 38-41.

None avails. Just like in this case, in *Murray Energy*, petitioners argued that EPA must consider "achievability" "in deciding <u>whether</u> to revise the NAAQS" and relied on *Alliance for Cannabis Therapeutics v. DEA*, 930 F.2d 936, 940 (D.C. Cir. 1991), to support an impossibility argument. *Compare* Ind. 38-39, *with* Opening Br. of Industry Pet'rs 22, *Murray Energy*, 936 F.3d 597 (No. 15-1385) (emphasis added), JA2850, *and* State Pet'rs' Opening Br. 30, *Murray Energy*, 936

---

[6] EPA's suggestion in a footnote (at 58 n.8) that it can sometimes consider "proximity to background" contravenes *API*'s and *Murray Energy*'s controlling holdings and, regardless, isn't properly before the Court. EPA disavows any such consideration here and provides no legal argument supporting its suggestion. *See Wisconsin v. EPA*, 938 F.3d 303, 328 n.3 (D.C. Cir. 2019) (refusing to consider issue raised in "lone, underdeveloped footnote" where issue may not have had any "actual[] impact[]").

F.3d 597 (No. 15-1385) (citing case), JA2854. Same argument, same citation, same result here.

Further, as *Murray Energy* held, Congress's decision to provide implementation-based relief mechanisms like the exceptional events provision, 42 U.S.C. § 7619(b), for states that can't attain NAAQS demonstrates that EPA cannot consider attainability in NAAQS-setting. 936 F.3d at 623-24. Congress also established $PM_{2.5}$-specific relief provisions to address emissions from sources like wildfires, expressly allowing EPA to "waive," in certain areas, attainment deadlines or "any requirement…under this subpart" depending on pollution resulting from "nonanthropogenic" and "anthropogenic sources." 42 U.S.C. § 7513(f); *NRDC v. EPA*, 706 F.3d 428, 436 (D.C. Cir. 2013) (Act unambiguously requires EPA to implement "$PM_{2.5}$ standards" under §§ 7513-7513b). Industry may not like these provisions, but the proper venue for its complaint is Congress, not this Court.

Seeking to inject attainability into the NAAQS-setting process, Industry cites (at 38) § 7502(c)(6), a provision about what types of measures states may need to include in their plans to implement NAAQS. 42 U.S.C. § 7502(c)(6). This provision doesn't speak to the requirements for NAAQS-setting, and thus "does not alter the fundamental details of" that process. *Whitman*, 531 U.S. at 468. And Industry's arguments about attainability would rewrite the Act. They would

transform the health-protective national standards the Clean Air Act requires into lowest-common-denominator standards: the lowest level EPA thinks all areas can attain, even if other areas can do better and even if widespread adverse health effects persist throughout the nation. That is antithetical to the NAAQS's foundational principle: Congress put health protection first. *See, e.g.*, *American Lung*, 134 F.3d at 388-89; *Lead Indus.*, 647 F.2d at 1149.

**Current air quality**: Industry wrongly argues EPA could refuse to strengthen a NAAQS when "current air quality in most areas" is better than the current NAAQS. Ind. 41 (emphasis added). This Court has twice rejected that argument. Resp. 66-68 (citing *API*, 684 F.3d at 1352-53); *NEDACAP*, 686 F.3d at 813. Under the Act, NAAQS "must protect not only average healthy individuals, but also sensitive citizens such as children, and if a pollutant adversely affects the health of these sensitive individuals, EPA must strengthen the entire national standard." *Battery Recyclers*, 604 F.3d at 618 (cleaned up). Industry's approach would violate the Act, for it would allow unhealthy air to persist in some areas simply because most areas have clean air. Further, NAAQS provide backstops against air quality deterioration, *see API*, 684 F.3d at 1352 (air quality could worsen to "just meet the existing" NAAQS), and NAAQS at unhealthy levels would allow future air quality anywhere to become unhealthy—an unreasonable result the Act doesn't countenance.

Notably, Industry here again repeats failed arguments. Industry neglects to cite *NEDACAP*, though that case makes clear petitioners relied on the use of "'as appropriate'" in "§ 7409(d)(1)." 686 F.3d at 813. *NEDACAP* petitioners' reply confirms that Petitioners here rehash decades-old arguments: that brief argued the issue was "whether it was 'appropriate' to revise the NAAQS"; contended EPA rendered "'as may be appropriate' in [§ 7409(d)(1)] a nullity"; and distinguished *Whitman* as addressing only § 7409(b). Reply Br. 27-28, *NEDACAP*, 686 F.3d 803 (No. 10-1252), JA2847-48; *see, e.g.*, Ind. 33-34, 37 (same arguments). "[U]navailing" in *NEDACAP*, 686 F.3d at 813, unavailing here.

**<u>Nondelegation</u>**: Petitioners give no basis for departing from *Whitman* and *Murray Energy*'s holdings that the Act's NAAQS-setting provisions are constitutional, 531 U.S. at 472-76; 936 F.3d at 624. *See* Resp. 53-56. Instead, Kentucky attenuates its argument—that "EPA's version of [*Whitman*] violates the nondelegation doctrine," State-Pet'rs 41—even further from the nondelegation doctrine than the argument *Murray Energy* rejected, *see id.* 41-43. In *Murray Energy*, "Petitioners claim[ed] that EPA's <u>interpretation</u> of the Act has <u>created</u> a nondelegation problem," but the Court explained this argument was misplaced because, as *Whitman* held, "in a nondelegation challenge, 'the constitutional question is whether the <u>statute</u> has delegated legislative power to the agency.'" 936 F.3d at 624 (emphasis in original; quoting *Whitman*, 531 U.S. at 472). Kentucky

provides no authority to support its novel contention that the nondelegation doctrine could apply to an agency's interpretation of Supreme Court precedent.

* * *

Nothing relevant has changed since these arguments originally failed. This Court thus must unequivocally reject them yet again.

## CONCLUSION

The petitions should be denied.

Dated: October 15, 2024

Respectfully submitted,

*<u>/s/ Seth L. Johnson</u>*
Seth L. Johnson
Marvin C. Brown IV
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 797-5245
(202) 794-5355
sjohnson@earthjustice.org
mcbrown@earthjustice.org

*Counsel for Alliance of Nurses for Healthy Environments, American Lung Association, Environmental Defense Fund, Natural Resources Defense Council, Northeast Ohio Black Health Coalition, Rio Grande International Study Center, and Sierra Club*

*<u>/s/ Shaun A. Goho (w/permission)</u>*
Shaun A. Goho
Hayden W. Hashimoto
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 678-2516
sgoho@catf.us
hhashimoto@catf.us

*Counsel for Citizens for Pennsylvania's Future and Conservation Law Foundation*

*/s/ John Walke (w/permission)*
John Walke
Emily Davis
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org

*Counsel for Natural Resources Defense Council*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), D.C. Circuit Rule 32(e)(2)(C), and the Court's May 14, 2024, Order establishing the briefing format, counsel hereby certifies that the foregoing Final Brief of Health, Environmental, and Community Group Respondent-Intervenors contains 6,342 words, as counted by counsel's word processing system, and thus complies with the limit of 11,700 words shared between Health, Environmental, and Community Group Respondent-Intervenors and State Intervenors. This document further complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure, 32(a)(5) and (a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 using size 14 Times New Roman font.

Dated: October 15, 2024

*/s/ Seth L. Johnson*
Seth L. Johnson